GAIL MARIE GOSSELIN FERRIS, administratrix, *vs.* MONSANTO
COMPANY; LEY CONSTRUCTION COMPANY,
third-party defendant.

Hampden. February 4, 1980. — May 21, 1980.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Negligence,* One owning or controlling real estate, Duty to warn, Toward
employee of independent contractor, Trespasser, Comparative.

In an action for the wrongful death of a painter employed by a subcon-
tractor at the defendant's plant, the judge erred in introducing mis-
leading considerations of "trespass" in his instructions to the jury.
[701-705]

CIVIL ACTION commenced in the Superior Court on June
24, 1975.

The case was tried before *Moran, J.,* a District Court
judge sitting under statutory authority.

After review was sought in the Appeals Court, the Su-
preme Judicial Court, on its own initiative, ordered direct
appellate review.

*Gerard L. Pellegrini* for the plaintiff.

*Philip A. Brooks* for the Monsanto Company.

KAPLAN, J. John Ferris, twenty-six years old, employed
as a painter by a subcontractor at Monsanto Company's
Springfield plant, died of asphixiation through the discharge
of nitrogen into a pipe connected to his air hood. This was
an action for "wrongful death" (G. L. c. 229, § 2) by
Ferris's widow, administratrix of his estate, against Mon-
santo, charging it with breach of its duty to exercise reason-
able care with some emphasis on alleged failure to give ade-
quate warning of danger.[1] Monsanto impleaded Ley Con-

---

[1] A count for loss of consortium was dismissed as included in the count
for wrongful death, and no point is made of this on the appeal. A count

struction Company, the general contractor at the plant. After trial, a jury returned a special verdict which in answer to a question found Monsanto not negligent. Motion by the plaintiff to set aside the verdict and for a new trial was denied, and judgment entered for Monsanto in the main action and for Ley on the third-party claim. The administratrix appeals from the judgment for Monsanto and the new trial denial. Monsanto takes a protective appeal from the judgment for Ley. We hold that the plaintiff is entitled to a vacation of the judgment for Monsanto and to an opportunity for a new trial because of misdirection by the judge who introduced misleading considerations of "trespass" in his instructions to the jury. Correspondingly the judgment for Ley should be vacated.

We set out the evidence at some length, noting that there is no claim that either plaintiff or defendant was entitled to a directed verdict. The instructions are then described, and finally we examine their adequacy or fairness.

1. Monsanto contracted with Ley, as general contractor, to "restructure" part of the plant, and Ley subcontracted the painting work to H.L. Ross Co., Inc., which employed the decedent Ferris as a painter. Among the painting jobs was the sanding, priming, and painting of the inner surfaces of four silos located atop building No. 92. The silos were being adapted for the blending in pressurized atmosphere of resins for use in manufacturing plastic bottles. The paint to be applied was a hard epoxy, of a toxic composition. When the paint was sprayed, a source of compressed air was needed both to propel the paint through the spray gun and to supply air to the hood used by the painter to protect against the toxic fumes. Workmen entering such spaces as the silos were evidently required to secure daily permits.

Each silo, forty-five to fifty feet tall, with a diameter of fifteen to twenty feet, sat on a platform which rested on the

for "conscious suffering" (G. L. c. 229, § 6) apparently remained in the case but when the judge came to charge he did not mention it and no objection was taken to the omission.

roof of No. 92. To provide the compressed air, the subcontractor Ross company at first moved by crane to the roof of No. 92 a two horsepower electrical compressor with hoses reaching into the silo. But it turned out that because of the situation of the electrical source the compressor voltage dropped, reducing the air supply in the silo to an unworkable level.

Accordingly, John Olcott, foreman of a group of three then assigned to work on the silos (the others were Achilles Schiavetta and Bruce Adams), asked permission of Monsanto's "corporate engineering division" to use a Monsanto air line which originated at a compressor within building No. 92 and came out on the roof in the form of an "instrument air" pipe. Permission was granted to the Ross company by the engineer William Lancaster.[2] To tap into the pipe, it was necessary to uncap the end of the pipe, insert a shut-off valve to control the pressure, and put on a reducer to allow the painter's 3/8 inch hose to attach to the 3/4 inch Monsanto pipe. The other end of the painter's hose ran up to the entrance to the silo where one or more "Y" joints could be attached so that multiple hoses might be used for the air hoods and spray guns. The painters began using Monsanto air for their air hoods sometime in June, 1974. Other workers, including Ferris, joined the project under these conditions in June or July. But only in early August when Ferris and Adams began to apply the epoxy paint was air required to work the spray guns.

Toward the end of July, Monsanto began installing a so called "flip-flop" system, preparatory to providing sixty pounds per square inch air pressure in the silos necessary for the blending process. An auxiliary line was connected to the instrument air pipe so that, when pressure dropped below the indicated level, pure nitrogen would be pumped into the pipe to raise the pressure.

On August 5, about a week before the flip-flop system was to become functional, Jack Barry, a Monsanto engineer,

---

[2] Under Monsanto's safety regulations prescribed for contractors, Monsanto's lines could be used by them only with permission.

revoked the permission the Ross company had been given and told Schiavetta (who had become foreman, Olcott having been transferred) to stop using that air. On August 7 Lancaster repeated the order. And in early August a memorandum from the corporate engineering division stating that Monsanto air lines should not be used was posted in the workmen's lunchroom. Schiavetta told his men to stop using Monsanto air and, according to Schiavetta, they complied.

On the question whether a reasonable effort was made to convey knowledge to those affected about a reason of safety for the order forbidding use of Monsanto air, we have the following. There was conflicting testimony whether Schiavetta knew of that reason or informed the men of it. Anthony F. Nunes, head foreman for Ley at building No. 92, testified that Schiavetta admitted to having received the memorandum. Schiavetta said he did not recall the memorandum. He testified he never knew there was a safety reason or that any but normal air ran in the pipe: Barry had not given a reason for his order. There was some evidence (from a government inspection report) that when Lancaster told Schiavetta not to use the air he gave reasons unrelated to safety. James Basile, a Ley employee, head safety officer at the project for converting No. 92, testified that he told Schiavetta about the flip-flop system during the second week of August, and that at the time he (Basile) did not know that the auxiliary source would pump nitrogen. But by mid-August, according to Basile, it was "known knowledge in the plant" that the flip-flop was going in with some sort of chemical backup. Basile also said that around August 14 Barry told him the painters were again using Monsanto air (it is not indicated how often or to what extent) and that he should tell them to get off it. Basile said he told this to Schiavetta but did not mention that the backup was nitrogen, although by this time Basile knew it. Basile testified further that he overheard Schiavetta tell his men around August 14 they should stay off the Monsanto line because of the flip-flop installation, but Schiavetta said merely that the air they were taking was reducing pressure on in-

struments connected to the air line which interfered with their calibration.

According to Basile, Ferris was one of the group to whom Schiavetta made these remarks. Ferris was shop steward and would be expected to attend safety meetings conducted by Basile on Friday afternoons after work. At perhaps three of these meetings after the memorandum was sent down, Basile stressed, so he said, the fact of the "change over" as the reason why the painters should stay off the air line; but it does not appear he disclosed a safety reason. He said Ferris was present at one, at least, of the meetings.

It seems that to the time of the accident the valve and reducer remained in place on the Monsanto pipe on the roof of No. 92. From the mere appearance of the pipe an onlooker would not surmise that there was a lethal danger of nitrogen; nor was any warning posted on or near the pipe.

We now approach more specifically the fatal accident on August 21. When permission to use Monsanto air was revoked, another source had to be found for the painters. Barry and Lancaster were able to secure from Ley a large gas-powered compressor which was placed on the ground some forty to fifty feet from No. 92, on the other side of railroad tracks alongside the building, with a hose running from one of the three compressor outlets up the side of the building, and Y joints appropriately arranged. There was no trouble until Monday, August 19. On that and the following day, Ley construction workers tapped into other outlets on the compressor to power jackhammers breaking up an asphalt driveway near No. 92. This reduced the air pressure available to the painters Ferris and Adams at work using the epoxy paint spray. They complained to Schiavetta who talked to the Ley operators. The Ley people said the use was temporary and Schiavetta took no further steps.

The night of August 20, Ferris, Schiavetta, Adams, and others worked an overtime shift to paint safety lines within building No. 92. This job required compressed air for spraying but not for air hoods. For fear that a freight train in bad light might run over the hose lying on the track,

Schiavetta told Adams to take up the hose and hook it to the Monsanto pipe on the roof of No. 92 and run it into the building, and that connection was made, the valve and reducer being still in place. Schiavetta knew this was against instructions but he testified it was the first time he had transgressed. On finishing the overtime work, Schiavetta had Adams unhook the hose and leave it coiled on the roof. He said he told Ferris and Adams the line had to be unhooked because Monsanto air could not be used next day.

Next morning Schiavetta, Ferris, and Adams returned for the regular shift. About 8 A.M. Schiavetta had Adams drop the hose down to him on the ground so he could hook it to the Ley compressor. Between 8 and 10 A.M., while Schiavetta was attending to paper work, Ferris and Adams mixed the epoxy paint, and installed in the silo the bolts and hooks needed to suspend a movable painting chair on the inner wall of the silo. The Ley compressor was working but apparently not being used by the painters. After the 10 A.M. coffee break Schiavetta went up to check on Ferris and Adams. Ferris had just entered the silo to begin painting and Adams was outside the silo entrance on the platform above the roof. Schiavetta talked with Adams for two or three minutes. Adams was standing with his hand inside the silo. He felt wetness on the wall and, withdrawing his hand, found blood. Rushing into the silo the two men found Ferris, hood on, slumped in the chair seven or eight feet above the floor. Lowering him and removing the hood, they saw blood dribbling from his nose and mouth. He was unconscious and died on the way to Wesson Memorial Hospital.

Later investigation showed that Ferris had tied his air hood hose to the instrument air pipe, as was done the night before. A failed electrical cell in the compressor serving the pipe had actuated the nitrogen backup source so that the air delivered into Ferris's hood contained less than 1% oxygen. Schiavetta could only speculate that Ferris had used the Monsanto line because of inadequate pressure coming from the Ley compressor.

2. Upon evidence of this order, the judge, after denying motions for directed verdicts on the part of the defendant and third-party defendant, instructed the jury on the following lines. "[A] person is not negligent . . . for his conduct unless it breached a duty that is owed to someone and that breach of duty constitutes the negligence. . . ." The defendant's duty to Ferris was then said to depend on whether Ferris was a trespasser.[3] If he was not, the defendant owed him the "duty [of] ordinary care"; if he was a trespasser, the defendant's only duty was "to refrain from willful, wanton misconduct" toward him. The jury were to regard Ferris as a "trespasser to a chattel" if he was "intentionally using or intermeddling of a chattel in possession of another." But even if Ferris was a trespasser, the defendant would owe him a duty to warn him of any artificial condition on the land if "the trespassers intrude upon a limited area of land" and "there is reason to believe that such a trespasser will not discover" the artificial condition. This exception to the lesser duty owed a trespasser was limited by the judge's charge to those situations where the trespass was of a constant nature: "If you find that the trespasser was not a constant trespasser then the only duty owed by Monsanto is to refrain from wilful and wanton misconduct not to exercise ordinary care."[4]

The judge went on to discuss the third-party claim, comparative negligence, and computation of damages, and then laid out the seven questions for the jury, which follow. Was any negligence of the defendant the proximate cause of the accident? If the answer was No, the jury was not to go further. If their answer was Yes, they were to say whether

---

[3] The notion of a lesser duty by reason of the plaintiff's becoming a trespasser was not foreshadowed in the defendant's or third-party defendant's pleadings but was offered on the motions for directed verdicts.

[4] It appears that the judge was making a freehand adaptation of Restatement (Second) of Torts § 335 (1965), entitled "Artificial Conditions Highly Dangerous to Constant Trespassers on Limited Area," with the possible implication that the air pipe could substitute for the limited area of land to which § 335 refers.

any negligence of Ferris was the proximate cause of the accident. If that question was answered Yes, they were to state the percentages of negligence attributable respectively to Ferris and the defendant. A fourth question asked the monetary value of Ferris to his wife and child. After a further question (independent of the third question) about the possible negligence of the third-party defendant and employees of the subcontractor, a sixth question asked whether Ferris intentionally and knowingly tied onto the instrument pipe just before the accident, and a seventh, whether Ferris then knew the defendant had forbidden such action.

The jury answered the first question No and on that basis judgments entered for the defendant and third-party defendant.

3. The interjection of instructions on "trespass" was a mistake. Those instructions in the context of the charge as a whole would have been wrong under the older law, and were equally wrong or more so under the reformed law brought in by *Mounsey* v. *Ellard*, 363 Mass. 693 (1973), and elaborated in, e.g., *Pridgen* v. *Boston Hous. Auth.*, 364 Mass. 696 (1974); *Soule* v. *Massachusetts Elec. Co.*, 378 Mass. 177 (1979); see also *Young* v. *Garwacki, ante* 162 (1980).

Ferris, working on the defendant's premises as an employee of a company performing work for the defendant, would have been classified by the unregenerate law as an "invitee" or "business visitor." To such a person the landowner would, in general, owe a duty of reasonable care. See *Adams* v. *George Lawley & Son*, 314 Mass. 87, 89 (1943); *Gray* v. *Boston, Revere Beach & Lynn R.R.*, 261 Mass. 479, 482 (1928). The development starting with *Mounsey* has had the effect of erasing the line between "invitees" and "licensees" (the latter a less favored class under the older law) and making the owner's liability toward both former classes — toward all lawful visitors — depend on his negligence in all the circumstances of the particular case. Certainly there was no intention to lower the general standard of care owed to those who would previously have been

styled invitees.   See *Mounsey* v. *Ellard, supra* at 708;
*Powers* v. *Bethlehem Steel Corp.*, 483 F.2d 963, 964 (1st
Cir. 1973) (interpreting *Mounsey*).

Indeed, in line with the *Mounsey* principle, a regrettable
twist in the older law regarding employees of independent
contractors has been expressly eliminated.   It used to be
said, as in *Gallo* v. *Leahy*, 297 Mass. 265, 268 (1937), that
"the owner of land has the duty, to workmen of an independ-
ent contractor coming on his premises for the purpose of do-
ing work at the owner's request, to disclose to them hidden
defects of which he knows or of which in the exercise of
reasonable care he should know."   See *Afienko* v. *Harvard
Club*, 365 Mass. 320, 327-328 (1974); *Findlay* v. *Rubin
Glass & Mirror Co.*, 350 Mass. 169, 172 (1966).   This ap-
peared consistent with an owner's general duty of due care
toward these employees; and it must be emphasized that
owner-warnings that certain implements on the premises
were dangerous were not taken to alter the status of the
employee who nevertheless used them: the question was
simply whether the owner had met his due-care obligation
to give warning adequate in the circumstances (and corre-
spondingly whether his employee had been contributorily
negligent in the face of the warning).   See, e.g., *West* v.
*Molders Foundry Co.*, 342 Mass. 8, 12 (1961); *Barrett* v.
*Builders' Patent Scaffolding Co.*, 311 Mass. 41, 43-45
(1942); *Lawler* v. *General Elec. Co.*, 1 Mass. App. Ct. 220,
223 (1973).

But insistence that the employee demonstrate that the de-
fect was "hidden" (but detectable through reasonable in-
spection by the owner) had, as a practical matter, unfairly
handicapped the employee in asserting his claim and thus,
in effect if not in terms, derogated from the assumed obliga-
tion of the owner to exercise due care.   Therefore, in *Poirier*
v. *Plymouth*, 374 Mass. 206 (1978), decided some six
months before Ferris's trial, we reformulated the doctrine
expressed in *Gallo*.   Henceforth the owner's liability was to
be measured in terms simply of his general duty to "take
those steps to prevent injury that are reasonable and appro-

priate under all the circumstances." *Poirier, supra* at 228. Of course an owner in given circumstances might fulfil his entire responsibility toward the employee of an independent contractor by taking reasonable steps to give appropriate warning of the dangers involved in using an appliance, but this would not change the employee who had nevertheless used the thing into a "trespasser" to whom some lesser duty was owed. See *id.* at 227 & n.9.

Thus both the old and the current law teach the irrelevance of concepts of trespass in considering rights of the employee vis-à-vis the owner. If, as Dean Prosser thought, the explanation of the traditional treatment of trespassers is that "in a civilization based on private ownership, it is considered a socially desirable policy to allow a man to use his own land in his own way, without the burden of watching for and protecting those who come there without permission or right" (W. Prosser, Torts 359 [4th ed. 1971]), then that policy has small bearing on the present facts — an employee working in a permitted space and using the owner's appliance thereon in the attempted service of the interests of the owner.[5] Those cases which have spoken of trespass to chattels involve incursions on other people's property very different in character from the present situation.[6]

As we hold that the judge's charge with respect to trespass was not apposite to any reasonable view of the facts in the

---

[5] The circumstances mentioned serve to distinguish the present case from those standard situations where so called invitees exceeded the bounds of their "invitations," usually in the physical sense, and the pursuit of missions of their own, not in the course of efforts to carry out business purposes of the occupier. See e.g., *Smith* v. *Simon's Supply Co.*, 322 Mass. 84 (1947); *Lerner* v. *Hayes-Bickford Lunch Sys., Inc.*, 315 Mass. 42 (1943); *Richardson* v. *Whittier*, 265 Mass. 478 (1929); *Holbrook* v. *Aldrich*, 168 Mass. 15 (1897).

[6] See *Marengo* v. *Roy*, 318 Mass. 719, 721 (1945); *Scott* v. *Boston Elevated Ry.*, 318 Mass. 31, 33 (1945); *Falardeau* v. *Malden & Melrose Gas Light Co.*, 275 Mass. 196, 199 (1931). It is suggested in *Marengo* that it is a condition of trespass to a chattel that the act be "intentional." See also *Ryder* v. *Robinson*, 329 Mass. 285 (1952). Cf. Restatement (Second) of Torts § 166 (1965) regarding accidental entries on land.

case, we need not consider what would be the defendant's duty toward Ferris, were he indeed a trespasser.[7]

Thus we conclude that the judge should have charged the jury to consider whether and to what extent the defendant or Ferris was negligent (the regime being one of comparative negligence) without distorting the inquiry by interpolating the charge about supposed trespass and factors that might mitigate the trespass. The whole course of conduct on both sides was to be taken into account. This would not mean that Ferris's possible disobedience of orders or possible indifference to warnings would fall out as unimportant. With respect to the warnings, questions would arise as to whether the defendant had acted reasonably in relation to the seriousness of the danger. These would involve inquiries into the substance of the warnings — was a safety reason in fact given? — and into the precautions taken to have the warning actually reach the individual painters.[8] But the reasonableness of the painters' reactions, in particular Ferris's, was also to be appraised, bearing in mind that the nature of the defendant's plant itself gave notice of hazards. To be weighed were the facts, if they appeared to be facts, that the reducer remained on the pipe and no keep-off or danger sign was affixed. We are far from canvassing all the factors or prejudging the matter, and are merely intent to make the point that negligence standards should have been invoked, unmixed with trespass.

There is argument that the question of the relevance or correctness of the instruction about trespass is not significant because the jury did not get to that issue or attempt to answer questions 6 and 7; they found the defendant free of negligence, not merely of wilful or wanton misconduct.

[7] As to that question, see *Soule* v. *Massachusetts Elec. Co.*, 378 Mass. 177, 185-186 (1979), and Hennessey, C.J., concurring, at 187; Kaplan, J., concurring in a contrary sense, at 187, 187-188.

[8] As to the elements entering into the adequacy of warnings of danger, see Restatement (Second) of Torts § 343A, Comment f; § 344, Comment e; 2 F. Harper & F. James, Torts § 27.13 (1956); W. Prosser, Torts 394-395 (4th ed. 1971).

The trouble is that discriminations were not sharply or clearly taken in the charge, and relatively so much attention was paid to trespass that the jury may well have considered the negligence standard to equate with the standard to be applied to conduct toward trespassers having no excuse. Especially may they have been led to this error, if they thought Ferris to be such a trespasser (or, indeed, any kind of trespasser). We think the added freight of the charge regarding trespass created risks of misunderstanding that cannot be wished away.

The plaintiff could have been more incisive in registering her objections, but she made known her disagreement with questions 6 and 7 about trespass, and also voiced it in requests to charge which were denied, and on motion for a new trial. We may add that, by objections to the charge and requests to charge, she also sought to induce the judge to guide the jury more explicitly on the subject of the warnings, which was naturally of considerable importance to a just verdict.

The judgments for the defendant and third-party defendant are reversed, and the case will stand for a new trial.

*So ordered.*