**Peter RYBA, Plaintiff,**

v.

**Eugene LaLANCETTE, Ruth La-Lancette, and Mark LaLancette, Defendants.**

**No. CIV.A. 03–40210–FDS.**

United States District Court, D. Massachusetts.

March 1, 2006.

Kathleen R. Daigneault, Law Office of Kathleen, Reynolds Daigneault, Leominster, MA, for Peter Ryba, Plaintiff.

Mark A. Darling, Litchfield Cavo, LLP, Lynnfield, MA, for Mark La Lancette, Defendant.

Peter A. Palmer, Fuller, Rosenberg, Palmer & Beliveau, Worcester, MA, for Eugene La Lancette, Ruth La Lancette, Defendants.

### MEMORANDUM AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

SAYLOR, District Judge.

This is an action in negligence arising out of the collapse of a scaffolding at a private home. Jurisdiction is based on diversity of citizenship.

Plaintiff Peter Ryba was injured while helping to install a new roof on the summer home of defendant Eugene LaLancette, who was then his father-in-law. Defendant Mark LaLancette, Eugene's son, was also working on the project, together with other family members. While Ryba was mounting an aluminum ladder that was part of the scaffolding, the ladder gave way, causing the scaffolding to collapse. Ryba suffered multiple broken bones and other injuries as a result.

Defendants have moved for summary judgment on the grounds that plaintiff does not identify any breach of duty by any of them, and that in any event they owed no duty to Ryba. Defendants are correct that plaintiff has submitted no evidence of any breach of duty—or indeed articulated any factual theory as to how the accident occurred, or what defendants did or did not do that might have caused it.

The claim can survive, if at all, only under a theory of *res ipsa loquitur.* Ryba has put forward sufficient evidence for the claim to survive summary judgment on the first element of that theory; the collapse of a scaffolding is not something that ordinarily occurs in the absence of negligence. Nonetheless, Ryba has failed either to eliminate the conduct of himself or third parties as the cause of the accident or to establish that the alleged negligence fell within the scope of any defendant's duty to him. Accordingly, defendants' motion for summary judgment will be granted.

### I. *Factual Background*

Defendants Eugene and Ruth LaLancette own a summer home in Rindge, New Hampshire. On the afternoon of September 16, 2000, both Eugene and Ruth were

present at the property, as were their four children—Mark LaLancette, David La-Lancette, Katherine Shoemaker, and Michelle Ryba—and their sons-in-law, Mark Shoemaker and plaintiff Peter Ryba.

Apparently some combination of LaLancette family members had decided, at some prior point, to put a new roof on the summer home. (Ryba Interrog. Ans. 4; Mark LaLancette Dep. at 26). There is no evidence as to how the group came together, or exactly what each person agreed to do.[1] Family members had previously worked on construction projects together, including putting a new roof on an addition at the home of Mark LaLancette. (Eugene LaLancette Dep. at 57; Mark LaLancette Dep. at 63–67).

Mark LaLancette had prior experience as a professional building contractor, including experience with roofing; his brother-in-law, Mark Shoemaker, had worked with him in that business. (Mark LaLancette Dep. at 7–8). Nonetheless, all witnesses (including Ryba) testified that no person was or appeared to be in charge of the project, and all worked together cooperatively. (Ryba Dep. at 95–97; Mark LaLancette Dep. at 66–67; Ruth LaLancette Dep. at 51–52). There is no evidence that any family members contributed any money to the project (other than Eugene, who purchased the roofing materials) or were compensated in any way. (Eugene LaLancette Dep. at 23).

Scaffolding was erected for the purpose of removing the old roof and installing the new one. Mark LaLancette testified that he does not remember who set up the scaffolding or even whether he participated in its erection. (Mark LaLancette Dep. at 31–33). Eugene testified that the scaffolding was put up by all of the people involved in doing the work, but could not identify any specific individual. (Eugene LaLancette Dep. at 19, 57).[2] It is undisputed, however, that Ryba was not involved in the erection of the scaffolding. (See Ryba Dep. at 47; Mark LaLancette Dep. at 32).

The scaffolding consisted of three extension ladders, an aluminum system of brackets or "ladder staging," and wooden planks. (Ryba Dep. at 47, 51–52; Mark LaLancette Dep. at 26–31).[3] The three ladders were leaning against the house, with the planks running between them. The left- and right-hand ladders were made of aluminum, and the middle ladder was made of fiberglass. (Ryba Dep. at 58; Mark LaLancette Dep. at 27).[4]

Eugene owned and provided the two aluminum ladders supporting either side of the scaffolding. (Mark LaLancette Dep.

1. Although plaintiff argued at the hearing that Eugene "asked" the family members to do the roofing project, there is no record evidence to that effect.

2. Plaintiff argues that the claimed lack of memory of Eugene and Mark LaLancette on this subject is not credible. While that may be true—and for purposes of summary judgment, the Court assumes that it is—it is not the same as affirmative evidence as to who did, in fact, erect the scaffolding.

3. Mark LaLancette testified that there were three ladders supporting the scaffolding: two aluminum ladders (one 12 feet long and one 24 feet long) provided by Eugene, and one fiberglass ladder (24 feet long) provided by Mark LaLancette. (Mark LaLancette Dep. at 26–27). Both Ryba and Eugene testified that there were two aluminum ladders supporting the scaffolding, both provided by Eugene. (Ryba Interrog. Ans. 4; Eugene LaLancette Dep. at 17). Whether there were two or three ladders, the parties agree that Eugene's 12-foot aluminum ladder was located on the left side and his 24-foot aluminum ladder was on the right.

4. Ryba testified that the wooden planks were between seven and eight feet above the ground. (Ryba Dep. at 58).

at 27). The left-hand aluminum ladder, which was the one that collapsed, was twelve feet long. Eugene acquired the ladder from his deceased aunt, who had acquired it after her husband's death. (Eugene LaLancette Dep. at 17–18).

There is no evidence as to who provided the planks or the metal support system. (*See id.* at 19–22). It is undisputed, however, that Ryba did not provide any materials for the scaffolding.

Ryba apparently was not present at the beginning of the roofing project. He came to the house, however, on the afternoon of September 16 to help with the project. Prior to his arrival, Ryba had consumed alcohol; his best memory is that he drank four light beers and two to three mixed drinks. (Ryba Dep. at 38–40).[5]

Just prior to the accident, three men— Mark LaLancette, David LaLancette, and Mark Shoemaker—were on the scaffolding working on the roof. (*Id.* at 52; Mark LaLancette Dep. at 35).[6] At some point, Ryba came out "and asked the guys what they wanted me to do." (Ryba Interrog. Ans. 11). Ryba was initially asked to help pick up the debris on the ground from the removal of the old roof, which he did for a period of time. (Ryba Dep. at 46–47). At some point, one of the three men on the scaffolding—Ryba does not recall whom— asked him to bring roofing materials up the ladder to the scaffolding. (*Id.* at 49, 96–97; Ryba Interrog. Ans. 11).

Ryba made two trips up the ladder without incident. In both instances, he went up the left-hand aluminum ladder. (Ryba Dep. at 52–53). On the first trip, he carried a roll of tar paper weighing about 20 or 25 pounds, which he handed to Mark Shoemaker on the scaffolding. (*Id.* at 53–54). At the time, Ryba weighed about 225 pounds. (*Id.* at 40). On the second trip, he carried a half bundle of shingles weighing about 50 pounds on his right shoulder. (*Id.* at 55–58). During his first and second trips up the ladder, Ryba did not notice anything unsafe about the ladder. (*Id.* at 53–59). In between his trips up the ladder, Ryba continued to pick up debris. (*Id.* at 55, 60).

On his third trip, he carried another half bundle of shingles, again weighing about 50 pounds, on his right shoulder. (*Id.* at 60–62). He does not remember who asked him to bring up the shingles. (*Id.* at 60– 61). As Ryba stepped onto the third or fourth rung, the ladder collapsed inward toward the house, causing him to fall to the ground. (*Id.* at 62–63). He fractured several bones in his left hand as a result of the initial impact. (Ryba Interrog. Ans. 4). The buckling of the ladder caused the scaffolding to collapse upon Ryba, fracturing his tibia and fibula. (*Id.*). Finally, Mark LaLancette and Mark Shoemaker fell from the scaffolding and landed on top of him, fracturing his femur. (*Id.*).

Ryba was taken to Health Alliance Hospital in Leominster, Massachusetts, and later transferred to UMass–Memorial Medical Center in Worcester, Massachusetts. (Ryba Interrog. Ans. 17). He also sustained post-operative injuries, including a pulmonary edema and aspiration pneumonia. (*Id.* Ans. 16).

The ladder that buckled was discarded by Mark LaLancette approximately a week after the accident, apparently before

---

**5.** Ryba estimates that the drinks, a mixture of Southern Comfort and Diet Coke, each contained between an ounce and an ounce-and-a-half of liquor. (Ryba Dep. at 39).

**6.** Eugene testified that he assisted in the project by cutting shingles on the ground and handing them up to the men on the scaffolding. (Eugene LaLancette Dep. at 57–58). Some of the women also assisted by picking up debris from the removal of the old roof.

anyone was aware that Ryba intended to bring a lawsuit. (Ryba Dep. at 104, 107; Eugene LaLancette Dep. at 59). It was never inspected by any expert of any kind.

Ryba testified during his deposition that he was not aware of anything that Eugene or Mark LaLancette did, or did not do, that caused or contributed to the collapse. (Ryba Dep. at 67, 104). Ryba does not intend to call any expert witnesses of any kind as to the reason for the failure of the ladder.

## II. Analysis

The complaint asserts two counts of negligence, one each against Eugene and Mark LaLancette.[7] To maintain a cause of action for negligence in Massachusetts, a plaintiff must prove the following elements by a preponderance of the evidence: (1) a legal duty owed by a defendant to the plaintiff; (2) a breach of that duty by the defendant; (3) proof that the breach was the proximate cause of the plaintiff's injuries; and (4) actual damage or injury. *Heinrich v. Sweet*, 308 F.3d 48, 62–63 (1st Cir.2002) (*citing Jorgensen v. Massachusetts Port Auth.*, 905 F.2d 515, 522 (1st Cir.1990)). Proof of the mere occurrence of an accident, without more, is not sufficient proof of negligence. *Osborne v. Hemingway Transport, Inc.*, 28 Mass.App. Ct. 944, 945, 550 N.E.2d 403 (1990).

There is no dispute that the scaffolding collapsed and that plaintiff was injured as a result. There is also no dispute that some combination of LaLancette family members, including Mark, erected the scaffolding, and that Eugene supplied the ladder that collapsed. Beyond that, however, plaintiff's proof is sparse in the extreme. Plaintiff has put forth no evidence that the ladder or other scaffolding materials were defective; that they carried inadequate warnings; that the scaffolding was improperly assembled; or that the scaffolding was improperly overloaded. Indeed, he has proffered no theory as to anything that the defendants did, or did not do, that constituted a breach of any kind of a duty to exercise reasonable care. And he has proffered no theory as to why the scaffolding collapsed, and intends to offer no evidence, expert or otherwise, as to the cause of the collapse.[8]

Plaintiff does not allege, and disclaims any intention to rely on, a theory of strict liability.[9] The question thus arises wheth-

---

**7.** Counsel for the plaintiff stipulated to the dismissal of defendant Ruth LaLancette at oral argument on November 10, 2005.

**8.** As noted, the ladder that collapsed was discarded after the accident. Plaintiff does not make any claim of spoliation of evidence. *Cf. McCarthy v. Van Aarle*, 2004 WL 1932666, at *3 (Mass.Super. July 19, 2004) (no spoliation sanction where ladder that collapsed was discarded before property owner became aware he might be target of lawsuit).

**9.** Plaintiff's counsel has nonetheless characterized the roofing work as a "dangerous" or "abnormally dangerous" activity, thus implicitly suggesting that principles of strict liability should somehow apply. As a general matter, a person who carries on an abnormally dangerous activity is subject to liability for harm resulting from the activity, even though the person has exercised the utmost care to prevent such harm. *Clark–Aiken Co. v. Cromwell–Wright Co.*, 367 Mass. 70, 88–89, 323 N.E.2d 876 (1975); RESTATEMENT (SECOND) OF TORTS § 519 (1977). The Court has been unable to find Massachusetts authority suggesting that roofing or scaffolding work qualifies as an "abnormally dangerous activity," or indeed imposing strict liability under circumstances remotely similar to the present case. *See, e.g., Clark–Aiken Co.*, 367 Mass. at 91, 323 N.E.2d 876 (damage from water that escaped from a dam); *Coughlan v. Grande & Son, Inc.*, 332 Mass. 464, 467, 125 N.E.2d 778 (1955) (damage from blasting activity); *see also Wood v. General Motors Corp.*, 865 F.2d 395, 411 n. 19 (1st Cir.1988) (automobiles not abnormally dangerous); *Thomalen v. Marriott Corp.*, 880 F.Supp. 74, 75–76 (D.Mass.1995)

er plaintiff's negligence theory can survive in the absence of any proof of breach of duty or causation, and without identifying any particular actor whose act or omission constituted such a breach.

## A. *Plaintiff's Theories of Recovery*

Plaintiff does not directly address the lack of evidence as to breach, causation, or identification of the actual alleged tortfeasor. Instead, he offers a variety of theories of recovery, several of which may be disposed of summarily.

■ First, plaintiff argues that Eugene LaLancette, as the owner and occupier of the property, had various duties as a landowner to repair or warn against dangerous or defective conditions on his property.[10] Plaintiff, however, has put forth no evidence to suggest that Eugene was aware, or reasonably should have been aware, that the scaffolding on his property was unreasonably dangerous or defective or otherwise presented any kind of hazard.[11]

■ Second, plaintiff argues that Eugene should be liable for providing a defective ladder. Eugene had a duty to avoid providing a ladder that he knew, or reasonably should have known, was defective.[12] But there is no evidence that the ladder was defective in any respect.

(fire-eating act not abnormally dangerous activity).

10. A landowner must exercise reasonable care to maintain his premises in a safe condition, but he is not an insurer of the safety of all entrants. *Glick v. Prince Italian Foods of Saugus, Inc.*, 25 Mass.App.Ct. 901, 901–02, 514 N.E.2d 100 (1987). He must take reasonable steps to keep the premises in repair and warn entrants of hidden dangers, but he does not have a duty to warn of open and obvious dangers. *Davis v. Westwood Group*, 420 Mass. 739, 743, 652 N.E.2d 567 (1995); *Beausoleil v. Massachusetts Bay Transp. Auth.*, 138 F.Supp.2d 189, 207 (D.Mass.2001). A landowners's duty extends to those who enter his land to work. *See, e.g., Ferris v. Monsanto Co.*, 380 Mass. 694, 701, 405 N.E.2d 644 (1980) (landowner's duty extends to independent contractors). However, if the worker knows or should know of the existence of a dangerous condition, the land occupant will not be liable for injuries resulting from such a condition. *See Beausoleil*, 138 F.Supp.2d at 207.

11. A landowner's duty of care "includes an obligation to maintain the premises in reasonably safe condition and to warn visitors of any unreasonable dangers of which the landowner *is aware or reasonably should be aware.*" *Davis*, 420 Mass. at 743, 652 N.E.2d 567 (emphasis added); *see, e.g., Thorson v. Mandell*, 402 Mass. 744, 749, 525 N.E.2d 375 (1988) (landowner did not have a duty to investigate the competence of the staff of a sublessee using its auditorium for drama rehearsal, especially where there is no evidence that would have put it on notice of inadequacies of the staff); *Coffey v. Keating*, 58 Mass. App.Ct. 1102, 787 N.E.2d 1154 (2003) (unpublished) (landowner did not have a duty to warn against the danger of an aggressive dog kept by a lessee where he did not know nor should he have known that the dog had a propensity to bite). Further, "[a] duty to warn is not imposed by law as a mindless ritual. A warning is not required unless 'the person on whom (the) duty rests has some reason to suppose a warning is needed.'" *Killeen v. Harmon Grain Products, Inc.*, 11 Mass.App.Ct. 20, 23, 413 N.E.2d 767 (1980) (quoting *Carney v. Bereault*, 348 Mass. 502, 506, 204 N.E.2d 448 (1965)).

12. Massachusetts recognizes that a person who supplies a chattel for another to use has a duty to exercise reasonable care to inform the user of a condition which the supplier knows or has reason to know makes the chattel dangerous for the use for which it is supplied, unless the supplier has reason to believe that the user will realize its dangerous condition. *Mann v. Cook*, 346 Mass. 174, 176–77, 190 N.E.2d 676 (1963) (citing Restatement (Second) of Torts § 388); *see also Slate v. Bethlehem Steel Corp.*, 400 Mass. 378, 382, 510 N.E.2d 249 (1987). The conduct of manufacturers, sellers, and others who supply chattels in a business context are covered by specific standards not relevant here.

Plaintiff argues that there is evidence that the ladder was of unknown age and origin, having been handed down to Eugene from a relative. That is plainly not enough. *See Gauld v. John Hancock Mutual Life Ins. Co.*, 329 Mass. 724, 726–27, 110 N.E.2d 318 (1953) (evidence that wooden ladder had been on roof and exposed to the weather for seven or eight months insufficient to prove defect); *Calvanese v. W.W. Babcock Co.*, 10 Mass.App.Ct. 726, 732, 412 N.E.2d 895 (1980) ("A wooden stepladder is a relatively uncomplicated and sturdy product, the parts of which are not likely to fail under normal use or to deteriorate from natural causes."); *McCarthy*, 2004 WL 1932666, at *2 (property owner had no reason to suspect that aluminum ladder that she inherited from her father was defective); *see also Coyne v. John S. Tilley Co.*, 368 Mass. 230, 237, 331 N.E.2d 541 (1975) (trier of fact could deem it improbable that ladder which collapsed had been damaged in handling after manufacture based on the fact that it appeared to be "bright, new, and defect-free"). All that can be reasonably inferred from the evidence here is that the ladder was made of aluminum and was not new; there is no evidence (nor any reason to suspect) that an aluminum ladder becomes unsafe simply because it is no longer new. And certainly there is no evidence that Eugene was aware, or reasonably should have been aware, that it was defective.

Third, plaintiff argues that Mark La-Lancette should be liable for providing defective materials in the construction of the scaffolding. If, in fact, Mark donated or supplied materials for the scaffolding, he would have had a duty to avoid providing materials he knew or should have known were defective. Restatement (Second) Torts §§ 388, 405 (1965). A person is usually entitled to assume that an object is in a normally fit condition unless there is reason to suspect the contrary. *Id.* at § 307. According to the evidence before the Court, Mark supplied a fiberglass ladder that did not collapse and (possibly) the scaffolding brackets. There is no evidence that he supplied any materials that caused or contributed to the collapse, much less that he supplied materials that he knew or should have known were defective.

Fourth, plaintiff argues that Eugene should be liable on the theory that the family members who were working on the roofing project were "independent contractors" undertaking an "abnormally dangerous activity" for which Eugene, as their "employer," should bear responsibility. There is no evidence, however, that the family members were in an employment relationship or were "independent contractors." Among other things, there is no evidence of a contract, no evidence that anyone was paid or expected payment, and no evidence that any of them were in the business or profession of roofing for hire. Furthermore, the roofing of a home is not an "abnormally dangerous activity" under Massachusetts law. *See supra*, n. 10.

Finally, plaintiff argues that defendants can be found liable under a "joint enterprise" theory. Before reaching the merits of that theory, the Court will first consider the application of the doctrine of *res ipsa loquitur* to this case.[13]

---

**13.** Plaintiff did not raise a theory of *res ipsa loquitur* anywhere in his pleadings, although counsel obliquely referred to it at the hearing: "I believe this is the kind of matter that if the doctor was supposed to go in and cut off the right leg, and he cuts off the left leg, anybody can know that that is a wrong. If the scaf-folding is set up, and it collapses, and it's compromised, and it falls down, clearly the construction of it was negligent." Transcript 31:4–9.

The Court will nonetheless consider the applicability of the theory. *But see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) ("It is

## B. *Res Ipsa Loquitur*

■■ The doctrine of *res ipsa loquitur* permits a trier of fact to draw an inference of negligence, in the absence of evidence of breach of duty or causation, in certain limited circumstances. Under the doctrine, a plaintiff may prove negligence, even when he cannot identify the specific breach of duty that caused the accident, if the accident is of the kind "that does not ordinarily happen unless the defendant was negligent in some respect and other responsible causes including the conduct of the plaintiff are sufficiently eliminated by the evidence." *Enrich v. Windmere Corp.*, 416 Mass. 83, 88, 616 N.E.2d 1081 (1993). There are three conditions necessary for the application of *res ipsa loquitur*: (1) the event must be one that does not ordinarily occur in the absence of negligence; (2) the evidence must sufficiently eliminate the plaintiff's and others' conduct as the cause of the event; and (3) the alleged negligence must fall within the scope of the defendant's duty to the plaintiff. *Tolentino v. United Parcel Service, Inc.*, 2001 WL 92201, at *5 (D.Mass. January 11, 2001); *Edwards v. Boland*, 41 Mass.App.Ct. 375, 378–79, 670 N.E.2d 404 (1996); Restatement (Second) Torts § 328D (1965).[14]

The unexplained collapse of a scaffolding or ladder is clearly an event that does not ordinarily occur in the absence of negli-gence. *See Coyne*, 368 Mass. at 235, 331 N.E.2d 541 (collapse of aluminum ladder); *Rice v. De Avilla*, 338 Mass. 793, 794, 155 N.E.2d 768 (1959) (collapse of staging); *Calvanese*, 10 Mass.App.Ct. at 732–34, 412 N.E.2d 895 (collapse of wooden ladder); *see generally* C.T. Drechsler, Annotation, *Applicability of res ipsa loquitur to injuries or death sustained by collapse, failure, or falling of scaffold*, 22 A.L.R.2d 1176, § 1 (1952) (collecting cases).[15] Plaintiff has therefore satisfied the first element of the theory.

■ The second element requires that the plaintiff produce evidence sufficient to eliminate his own conduct, and that of third parties, as probable causes of the occurrence. This element is satisfied "if a jury can find that the instrumentality causing the accident was in the sole and exclusive control and management of the defendant ...." *Larson v. Paley*, 2002 WL 986493, at *1 (Mass.App.Ct. May 14, 2002) (citing *Wilson v. Honeywell, Inc.*, 409 Mass. 803, 805–806, 569 N.E.2d 1011 (1991)); Restatement (Second) Torts § 328D, cmt. g. A plaintiff need not eliminate all possible causes of the accident, but must proffer evidence "sufficient to warrant an inference that the defendant was more likely responsible for the incident than someone else." *Wilson*, 409 Mass. at 806, 569 N.E.2d 1011; *see Diaz v. Sanchez*,

not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones ... Judges are not expected to be mindreaders. Consequently, a litigant has an obligation to spell out its arguments squarely and distinctly, or else forever hold its peace.") (internal citations omitted).

14. The plaintiff bears the burden of establishing the applicability of the doctrine. The Court must first determine whether the inference of negligence may reasonably be drawn by the jury; the jury must then find, by a preponderance of the evidence, that each of the three conditions is satisfied. *See Wilson*, 409 Mass. at 805–06, 569 N.E.2d 1011.

15. At least one older case seems to suggest the opposite, but its precedential value is doubtful in light of the trend of recent cases. *See Drum v. New England Cotton Yarn Co.*, 180 Mass. 113, 114, 61 N.E. 812 (1901) (*res ipsa loquitur* did not apply to collapse of wooden ladder); *see also Parsons v. Hecla Ironworks*, 186 Mass. 221, 224, 71 N.E. 572 (1904) (*res ipsa loquitur* did not apply to collapse of staging where evidence of causation was established).

2004 WL 2915456, at *2 (Mass.Super.Sept.30, 2004) (citing *Alholm v. Wareham,* 371 Mass. 621, 627, 358 N.E.2d 788 (1976)) (plaintiffs must present evidence from which inferences of probabilities, rather than just possibilities, can be drawn in their favor to withstand summary judgment on negligence claim).

It is far from clear that plaintiff has eliminated his own conduct as a probable case of the accident.[16] However, the Court will assume for summary judgment purposes that he has done so.

▇ The more significant issue is that plaintiff has not eliminated third parties as probable causes. "Identification of the party responsible for causing injury to another is a longstanding prerequisite to a successful negligence action." *Payton v. Abbott Labs,* 386 Mass. 540, 571, 437 N.E.2d 171 (1982). This is true even on a *res ipsa loquitur* theory: "[e]ven though there is beyond all possible doubt negligence in the air, it is still necessary [for plaintiff] to bring it home to the defendant"; "where it is clear that it is at least equally probable that the negligence was that of another," the case cannot proceed. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 39 (5th ed.1984). In the words of the Restatement:

It is never enough for the plaintiff to prove that he was injured by the negligence of some person unidentified. It is still necessary to make the negligence point to the defendant. On this too the plaintiff has the burden of proof by a preponderance of the evidence; and in any case where there is no doubt that it is at least equally probable that the negligence was that of a third person, the court must direct the jury that the plaintiff has not proved his case.

Restatement (Second) Torts § 328D, cmt. f.

Here, at least four actors—Eugene LaLancette, Mark LaLancette, Mark Shoemaker, and David LaLancette—appear to have exercised some control over the instrumentality causing the accident.[17] On the scant evidence presented to the Court, the two non-defendants (Mark Shoemaker or David LaLancette) are at least as likely to have been the probable cause of the accident as the two defendants (Eugene LaLancette and Mark LaLancette). Plaintiff has offered no evidence to eliminate the conduct of either of the two non-defendants as probable causes of the accident. Nor has he offered any evidence sufficient to eliminate the conduct of Eugene (and thus place the blame on the only other defendant, Mark) or to eliminate the conduct of Mark (and thus place the blame on the only other defendant, Eugene). As a result, plaintiff cannot prove it was more likely than not that either of the two defendants was negligent. *See Spencer v.*

---

**16.** For example, in *Coyne,* a case involving the collapse of an aluminum ladder, judgment for plaintiff was held to be in error where the "evidence concerning the plaintiff's use of the ladder [was] meager" and "was insufficient to exclude his own actions as a cause for the ladder's collapse." 368 Mass. at 238, 331 N.E.2d 541. The only evidence in *Coyne* concerning plaintiff's use of the ladder was that he was on it briefly to wash an overhead transom and door. Plaintiff did not show that he "put the ladder to the normal use for which it was intended ... [;][h]e could have overloaded the ladder with a variety of clean-

ing paraphernalia, or could have placed the ladder so that the leg which subsequently was bent inward bore an inordinate proportion of the weight." *Id.*

**17.** According to the evidence, some unknown combination of four family members (Mark LaLancette, Eugene LaLancette, David LaLancette, and Mark Shoemaker) erected the scaffolding, and one of three family members (Mark LaLancette, David LaLancette, and Mark Shoemaker) asked plaintiff to come up the ladder.

*Baxter Int'l, Inc.*, 163 F.Supp.2d 74, 79–80 (D.Mass.2001) (alternative liability theory failed in part because of plaintiffs' failure to join all possible defendants); *Payton v. Abbott Labs*, 386 Mass. at 571–73, 437 N.E.2d 171 (theory of market share liability failed in part because only six of what might be a larger number of potential tortfeasors were joined in products liability action); *Botteri v. Massachusetts Bay Transp. Auth.*, 1996 WL 628082, at *2 (Mass.App.Div. Oct.22, 1996) (trial judge could conclude that inference of negligence not warranted where plaintiff failed to eliminate third persons as the responsible cause of the escalator's stopping where there was testimony that children often activated the emergency stop button); *see generally* JOAN TESHIMA, ANNOTATION, *Applicability of res ipsa loquitur in case of multiple, nonmedical defendants—modern status*, 59 A.L.R.4th 201 (1988) (noting that plaintiff who fails to join all defendants who may be responsible for an injury may be denied the benefits of an inference of negligence of the defendants).[18]

Plaintiff has, however, suggested a final theory that might eliminate the need to tie the alleged negligence to any a particular defendant—"joint enterprise" liability. The Court will turn to that theory next.[19]

### C. *"Joint Enterprise" Liability*

 As noted above, plaintiff cannot identify any specific act or omission by any specific person that constituted the alleged negligence. At most, plaintiff can prove only that some or all of a specific group of family members undertook all of the relevant acts that may have led to the accident: supplying the materials, erecting the scaffolding, requesting that Ryba mount the ladder carrying supplies, and so on. Plaintiff's failure to identify the individual tortfeasor(s) would not be fatal if the roofing project had been undertaken by a legally-recognized organizational entity, such as a corporation or partnership. Thus, for example, if the individuals who undertook the roofing project constituted a business partnership, it might not be necessary to identify the actual individual whose act or omission led to the accident, as all could be equally liable as partners. *See, e.g., Bachand v. Vidal*, 328 Mass. 97, 99–101, 101 N.E.2d 884 (1951). Or, if one or the other defendant were the employer of all of the others as scaffolding erectors, the doctrine of *respondeat superior* might be used to impute the negligence of the employees to the employer. *See, e.g., Kelly v. Middlesex Corp.*, 35 Mass.App.Ct. 30, 32, 616 N.E.2d 473 (1993).

Plaintiff argues that the roofing project by the family members constituted a "joint enterprise," and that each is accordingly liable for the acts of the other. Although plaintiff does not articulate his theory in so many words, it appears that he is contending that the parties should be deemed in effect to have been acting as an informal partnership, making each responsible for the negligent acts of one another.

 In general, the negligence of any member of a joint enterprise may be attributed for purposes of liability to of any other member. RESTATEMENT (SECOND) TORTS § 491 (1965); *see generally Stock v.*

---

**18.** Plaintiff has also failed to establish that the alleged negligence fell within the scope of any duty of Eugene, Mark, or both. *Cf. Edwards*, 41 Mass.App.Ct. at 380, 670 N.E.2d 404 (as operating surgeon, it was within the scope of defendant's duty to his patient not to sever nerve and artery).

**19.** Plaintiff also argues that Eugene and Mark LaLancette should be found liable as "joint tortfeasors." This argument assumes its conclusion: both of them must be found to have committed a tort before they may be deemed joint tortfeasors.

*Fife*, 13 Mass.App.Ct. 75, 78, 430 N.E.2d 845 (1982). In order to establish the existence of a joint enterprise, the plaintiff must establish (1) an agreement, express or implied, (2) for a common purpose, (3) such that each member has an equal right to direct and control the operation of the enterprise. *See Stock*, 13 Mass.App.Ct. at 78, 430 N.E.2d 845; *see also Caron v. Lynn Sand & Stone Co.*, 270 Mass. 340, 346–47, 170 N.E. 77 (1930). Although in many states, and under the Restatement, the doctrine applies only where the members have a pecuniary interest at issue, there is no such requirement under Massachusetts law. *Lyon v. Ranger III*, 858 F.2d 22, 27 (1st Cir.1988); *see* Restatement (Second) Torts § 491 cmt. c.

Joint enterprise liability is a theory that has been chiefly employed "as a defendant's doctrine, imputing the negligence of another to the plaintiff." *Lyon*, 858 F.2d at 27 (citing Prosser and Keeton on the Law of Torts § 72); *accord Stock*, 13 Mass.App.Ct. at 79 & n. 5, 430 N.E.2d 845. The doctrine has attracted much criticism since its inception. *See, e.g.,* F. Harper, F. James, and O. Gray, the Law of Torts § 26.14 (2d ed.1986) (joint enterprise liability "does little good as a means of distributing accident losses, and it does much harm in preventing compensation to innocent plaintiffs though the imputation of

contributory negligence. It should be discarded.") (footnote omitted).

 While it has not yet been abandoned, the doctrine "is narrowly defined and narrowly applied," and "the relationship of joint enterprise is a serious matter which should not be found without some definite indication of the parties' intention to enter it." *Stock*, 13 Mass.App.Ct. at 78–79 & n. 5, 430 N.E.2d 845 (internal citations omitted). Indeed, read broadly, the "joint enterprise" doctrine would impose the possibility of vicarious liability in a huge variety of human enterprises. People frequently come together with an implicit agreement, a common purpose, and no formal management structure—in fact, virtually every form of informal and cooperative human endeavor fits that description. If the courts were to imply a right of mutual control simply from the absence of a structure of authority, vicarious liability would be extended far beyond its present confines.[20]

In any event, the Court has not found any instances where any court, in Massachusetts or elsewhere, has ever applied the "joint enterprise" doctrine in a context such as this. *Id.* at 79–80, 430 N.E.2d 845 (no joint enterprise in automobile trip for pleasure); *Caron*, 270 Mass. at 347, 170 N.E. 77 (same).[21] In fact, the doctrine

---

**20.** Suppose, for example, a number of friends and family members get together to play touch football: they agree on the rules (e.g., how the goal line is marked), they have a common purpose (playing a game), and no one person is in charge (there is no referee, and all disputes must be resolved by consensus). If someone plays too roughly and breaks another's arm, is everyone on the field potentially liable? Or suppose some friends form a book group: they agree on how the club will operate (the members agree to select a book each month and meet at a member's home to discuss it the following month), they have a common purpose (to read and discuss books) and no one person is in charge (every-

one must agree on the book and the schedule). If a member trips on a rug at a monthly book club meeting and breaks her arm, is everyone in the club potentially liable? If the doctrine of joint enterprise were not construed strictly, the possibility of vicarious liability would arise in all such situations.

**21.** Courts have been particularly reluctant to extend the "joint enterprise" doctrine to intra-family activities, at least outside the context of the operation of a motor vehicle. *See Weber v. Goetzke*, 371 N.W.2d 611 (Minn.App. 1985) (family project to clean up vacation property in order to sell it, preparatory to selling the property and sharing the proceeds,

appears to have been extended outside of the automobile context in Massachusetts on only one occasion. *See Lyon,* 858 F.2d at 27 (applied defensively to members of diving team). *But see Adams v. Dunton,* 284 Mass. 63, 67, 187 N.E. 90 (1933) (doctrine did not apply to members of duck hunting group where there was no basis to find that one hunter had the right or power to control the other's use of his gun).

*Lyon* involved a wrongful death action brought by the family of a scuba diver who was killed when he came to the water's surface and was then struck by a ship. The defendant impleaded the three members of the decedent's dive team. The trial court found that the diver and his dive team were collectively 45 percent responsible for the accident as a result of negligently developing the dive plan that failed to build in reasonable safety precautions. On appeal, the First Circuit found that the district court did not, in fact, impute the negligence of each diver to the others under a joint enterprise theory, but rather found the decedent scuba diver fully responsible for the negligent dive plan. 858 F.2d at 25. The court went on to hold in the alternative that the law *did* impute the negligent acts of the dive team to the decedent. In so doing, it predicted that Massachusetts "would apply [the joint en-

terprise] doctrine [ ] where the parties did not contest the common control of the diving plan." *Id.* at 28.

 Thus, and at a minimum, the right of common control or management among members is a necessary requirement to finding a joint enterprise. Here, plaintiff has failed to set forth facts from which a jury could find that the requisite degree of control was exercised among and between Mark LaLancette, Eugene LaLancette, Mark Shoemaker, and David LaLancette.[22] Even though all four may have shared the common purpose of roofing the home, there is no evidence as to their right(s), if any, to control the direction of the enterprise. Although the evidence establishes that no one person was in charge, and that all worked together cooperatively, it does not follow that each had the right to control or manage the others. Any inference as to the right of exercise of control on such limited evidence would be pure conjecture, and contrary to the principle that the doctrine is to be strictly construed and strictly applied.

Accordingly, because plaintiff cannot establish that roofing project constituted a "joint enterprise" within the narrow confines of that doctrine, plaintiff cannot es-

---

did not constitute a "joint enterprise"); *see also Flores v. Brown,* 39 Cal.2d 622, 248 P.2d 922, 926 (1952) (automobile accident involving family; "the family relationship standing alone is not sufficient to convert family activities into joint enterprises for purposes of imputing negligence.").

**22.** Even if a joint enterprise theory were viable here, the scope of the enterprise (roofing the house) would probably include the plaintiff himself. Plaintiff admits that he was at the site of the accident that day to help with the roofing. If plaintiff were found to have been a part of any joint enterprise, that fact alone would not preclude his ability to recover against any member of joint enterprise who was found to have acted negligently. *See*

*Alderman v. Noble,* 296 Mass. 30, 31–32, 4 N.E.2d 619 (1936). Nonetheless, a member of a joint enterprise who is himself negligent cannot sue and prevail against the other members, even if another member himself acted negligently. *See Lyon,* 858 F.2d at 24 (even on imputed negligence theory, decedent, who was negligent himself, was also responsible for the full negligence of the rest of the members of the joint enterprise); *see also Flanagan v. Baker,* 35 Mass.App.Ct. 444, 449, 621 N.E.2d 1190 (1993) (even if part of a joint enterprise with a defendant who did not act negligently, plaintiff could not recover against defendant by imputing the plaintiff's own negligence to him).

tablish the elements of a *res ipsa loquitur* theory, and therefore cannot establish that either defendant was negligent. The motions for summary judgment in defendants' favor will be granted.

### III. *Conclusion*

Accordingly, for the foregoing reasons, defendants' Motions for Summary Judgment are GRANTED.

So Ordered.